UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRACE DICKERSON,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>NATIONAL HOCKEY LEAGUE, and<br>NHL ENTERPRISES, L.P.,<br><br>　　　　　Defendants. | ECF CASE<br><br>No.: _____<br><br><br>COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

**PRELIMINARY STATEMENT**

1.　　From the outset of her employment with the National Hockey League and NHL Enterprises, L.P. (collectively, "NHL"), Grace Dickerson informed the organization that her documented disabilities would, at times, require flexibility with in-office attendance. She requested modest accommodations that were consistent with her essential job functions and in line with the organization's general remote work policy. In response, NHL senior leadership subjected Dickerson to offensive remarks and intrusive questioning about her medical conditions, often in public settings and in the presence of colleagues. NHL then delayed action on her requests, subjected them to unnecessary scrutiny, and ultimately provided only partial accommodations that were insufficient to meet her medical needs – all without providing any meaningful explanation.

2.　　Dickerson was treated less favorably than similarly situated employees without disabilities, reflecting a broader pattern of disparate treatment. The cumulative effect of NHL's conduct created a hostile work environment that worsened Dickerson's medical condition. This culminated in a serious medical crisis. When Dickerson sought temporary relief through remote work to recover, she was met with further hostility and told by executive leadership that her job

"may not be a good fit." Unable to safely return under these conditions, Dickerson was left with no choice but to resign.

3. Accordingly, Plaintiff asserts claims of disability discrimination and retaliation for engaging in protected activities in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL").

## THE PARTIES

4. Grace Dickerson is a resident of California, who was employed by Defendants in its office located in New York, New York.

5. National Hockey League is a joint venture, organized as an unincorporated association. It operates as a professional ice hockey league comprised of member clubs located across the United States and Canada, and it maintains a principal place of business in New York, New York.

6. NHL Enterprises, L.P. is a foreign limited partnership formed under the laws of the State of Delaware, with its principal business office located at One Manhattan West, 395 9th Avenue, New York, New York 10001. NHL Enterprises, L.P. manages the licensing, marketing, and sponsorship activities on behalf of the National Hockey League. NHL Enterprises, L.P. also oversees the League's commercial rights and intellectual property assets.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. Plaintiff is a citizen of California, and Defendants are citizens of New York for jurisdictional purposes.

8. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims occurred in this District, including Plaintiff's employment, and the discriminatory and retaliatory acts.

## STATEMENT OF FACTS

9. In September 2021, Dickerson applied for a position posted by the NHL under the job title "Executive Assistant" within its Office of Social Impact, Growth, and Legislative Affairs.

10. The essential responsibilities of the position included providing administrative support to Senior Executive Vice President ("SVP") Kim Davis. These duties included managing calendars, scheduling meetings and travel, processing expense reports, preparing correspondence, coordinating events, building presentations, assisting with speechwriting and background research, and personal tasks at Davis's direction.

11. In response to her application, NHL invited Dickerson to participate in a series of three interviews. Her first interview was with Vice President ("VP") Paul LaCaruba, the second with Project Coordinator Melissa Parnagian, and the third with Davis.

12. During each of these interviews, Dickerson disclosed that she had four diagnosed disabilities: Generalized Anxiety Disorder ("GAD"), Major Depressive Disorder ("MDD"), Irritable Bowel Syndrome ("IBS"), and Complex Post-Traumatic Stress Disorder ("C-PTSD").

13. During her interview with VP LaCaruba, Dickerson further explained that she suffered IBS flare-ups and back spasms, which were stress-induced and that her conditions would likely require flexibility with in-office attendance. She specifically asked whether the NHL would be able to accommodate remote work as a result of her medical needs.

14. At the time, all staff in the department to which Dickerson applied were working fully remotely due to the COVID-19 pandemic.

15. In response to her inquiry, VP LaCaruba acknowledged that NHL had learned during that period that much of the department's work could be performed remotely. He added that while the office was expected to reopen around the time Dickerson would be hired, remote work would not be a problem.

16. During her interview with Parnagian, Dickerson again discussed her disabilities and their implications on her ability to work in an office setting. She explained that stress-induced IBS flare-ups and back spasms could interfere with her capacity to work on-site and reiterated her need for remote work flexibility.

17. Parnagian engaged Dickerson in a detailed conversation about her health conditions, asking several questions to better understand how her disabilities could affect her ability to be physically present in the office. At the conclusion of the interview, Parnagian expressed that Dickerson was well-qualified for the position and assured her that NHL could offer remote work flexibility as needed to support her.

18. In her third interview, Dickerson again disclosed her medical conditions to SVP Davis. SVP Davis showed little interest in the subject and offered only a general statement that NHL employees were permitted to work remotely up to three days per week under company policy.

19. On or about October 8, 2021, the NHL extended a formal offer of employment to Dickerson, with an annual salary of $65,000. The position was structured so that Dickerson reported to VP LaCaruba and provided primary support to SVP Davis.

20. Dickerson felt a mix of excitement and anxiety. Although she was eager for the opportunity and confident in her ability to perform the role, she remained concerned about whether the in-office expectations could be reconciled with her medical needs.

21. On October 17, 2021, Dickerson emailed SVP Davis and SVP and Chief Human Resources Officer Patrice Distler in response to the offer. She reiterated: "I do have a medical condition that makes it difficult to work in an office setting when it flares up. Do you think the job will allow flexibility for me to work from home if that occurs on mandatory office days?"

22. SVP Davis responded by email requesting a phone call to discuss Dickerson's concerns further.

23. That call took place on or about October 18, 2021. During the conversation, Dickerson elaborated on how her disabilities could impair her ability to work in the office during flare-ups.

24. SVP Davis again responded vaguely, stating that NHL had policies in place that could accommodate her, but she did not offer any specific assurance. Wanting to be transparent, Dickerson explained that her health complications could last up to six months during a flare-up and may necessitate extended remote work. In response, SVP Davis stated, "That is okay," and "We'll deal with it when you start."

25. On or about October 20, 2021, Dickerson accepted NHL's job offer.

26. On November 1, 2021, Dickerson began employment.

27. Although the position had been posted as "Executive Assistant," and all interviews were conducted under that title, she was informed on her first day by VP LaCaruba that her official title was "Assistant."

28. VP LaCaruba also informed Dickerson that she was required to work in the office four days per week during her first week, stating this was at SVP Davis's request, but that she could reduce her in-office days later in accordance with NHL's remote work practices.

29. Dickerson observed that most of her department's employees worked remotely; of approximately fifteen staff, only a few came in that first week. She primarily communicated with colleagues via email and NHL's online messaging platform.

30. At the end of her first week, Dickerson requested to reduce her office days. SVP Davis denied the request without providing a reason, and Dickerson did not feel comfortable pressing further due to SVP Davis's stern demeanor.

31. Consequently, Dickerson continued to work four days per week in the office. She was the only employee required to maintain this schedule; all other colleagues were permitted two days per week in the office.

32. Dickerson found NHL's disparate treatment perplexing, particularly given her prior discussions regarding the need for remote flexibility.

33. Further, SVP Davis was present in the office at most one to two days per month, meaning that many of Dickerson's in-office responsibilities – assisting SVP Davis with technology, preparing for meetings, getting her coffee, and other ministerial tasks – were largely unnecessary in her absence.

34. By late October into November 2021, Dickerson began experiencing disability-related medical complications that limited her ability to work in the office.

35. On November 7, 2021, she emailed SVP Davis and Distler requesting information on the procedure to formally submit a disability accommodation request.

36. That same day, Distler informed Dickerson that she would need to submit a doctor's note specifying her accommodation needs.

37. On December 3, 2021, Dickerson submitted a letter from her physician substantiating her disability and need for accommodation and requested to work in the office an

average of two days per week, a modest request aligning her schedule with NHL's remote work practices and that of her colleagues.

38. Shortly thereafter, SVP Davis publicly confronted Dickerson in the office in front of three colleagues, questioning her about the accommodation request and the nature of her disabilities.

39. During the confrontation, Dickerson explained that her flare-ups involved stress-induced IBS and back spasms. SVP Davis pressed for detailed information about the severity, duration, and frequency of her symptoms, including instances of IBS-induced diarrhea and vomiting. Dickerson provided this information but found the exchange invasive and degrading.

40. On December 6, 2021, Distler informed Dickerson that NHL found her accommodation request insufficient and required an additional letter from her doctor reviewing her job description, with a deadline of December 17, 2021.

41. Unbeknownst to Dickerson at this time, her medical provider had recently experienced a death in the family and was closing her practice, making it impossible for Dickerson to meet NHL's timeline.

42. As Dickerson learned of these developments, she promptly informed NHL that she was transitioning to a new mental health provider, providing updates on December 16, 2021, and January 20, 2022.

43. On January 31, 2022, Dickerson submitted the requested additional medical information from her new provider, who stated: "Having reviewed the list of job responsibilities…[i]t is my recommendation that [Dickerson] be permitted to work from home 3 days a week, and further that this course of treatment be considered as a preventative care measure."

44. In February 2022, NHL reduced Dickerson's in-office requirement from four days to three, allowing her to work remotely two days per week.

45. NHL did not explain why it denied Dickerson's full accommodation request or why it set her in-office schedule to three days per week. This decision appeared arbitrary and inconsistent with her provider's recommendation, legitimate business needs, and the standard practices applied to her colleagues, who, upon information and belief, neither had similar disabilities nor requested comparable remote work accommodations.

46. Dickerson did not believe the accommodation met her medical needs but hesitated to raise her concerns with SVP Davis. By this point, whenever Dickerson broached the subject of remote work, SVP Davis reacted with hostility or posed intrusive questions, placing the burden on Dickerson to repeatedly justify her requests – despite NHL's full knowledge of her disabilities and documented medical needs.

47. Nevertheless, Dickerson performed her duties successfully. Although SVP Davis never provided a formal performance review, she consistently praised Dickerson's work as "great" with minimal critiques.

48. Indeed, beginning in 2022, the only critiques SVP Davis provided to Dickerson were directly related to her disabilities and requests for accommodation.

49. For example, starting around February 2022, whenever Dickerson and SVP Davis were together in the office, SVP Davis repeatedly commented on Dickerson's health, asking publicly, "Are you better yet?" "Are you going to get better?" and "I need you to get better."

50. These comments pressured Dickerson, made her feel devalued due to her disabilities, and exacerbated her stress and anxiety. They were made openly in front of coworkers, embarrassing her given the personal nature of her medical conditions.

51. Moreover, in March 2022, NHL hired another Assistant, Debbie Kim, whose responsibilities were almost identical to Dickerson's, but Kim was permitted to follow the standard two-day in-office practice from the start.

52. This clear and continued disparity in treatment underscored that NHL applied its policies inconsistently and singled out Dickerson, effectively penalizing her for requesting reasonable accommodations for her disability.

53. This, coupled with SVP Davis's treatment, caused Dickerson further distress, exacerbating her disabilities, worsening her symptoms, and making her working conditions increasingly intolerable.

54. In mid-March 2022, Dickerson asked SVP Davis for an additional remote workday for that week. Davis responded with clear displeasure, stating that Dickerson could take the extra day, but that the two of them would need to sit down "face-to-face" the following week to discuss her medical condition. This exchange caused Dickerson additional stress.

55. On March 26, 2022, Dickerson emailed Distler regarding her request to SVP Davis and SVP Davis's response.

56. Dickerson started by stating that her "health condition [had] been flaring up, which [had] been making it difficult for [her] to work in the office."

57. She further reported her most recent request to work from home and expressed discomfort with SVP Davis's response. Dickerson wrote: "I don't feel comfortable discussing the details of my medical condition, and the thought of being asked to do so has been exacerbating my anxiety levels and symptoms… I don't know what boundaries I'm allowed to assert with the executive–assistant power dynamic… [A]s my disability accommodation request explained, I have

co-occurring mental and digestive health conditions and I feel very anxious discussing such personal details in this setting."

58. Finally, Dickerson renewed her accommodation request, stating: "Can we discuss revisiting my initial accommodation request, especially since my conditions have worsened?"

59. On April 6, 2022, Dickerson and Distler had a phone call during which Distler informed Dickerson that NHL could increase her weekly remote work allowance to three days. Distler also stated she would speak to SVP Davis about her continued habit of questioning Dickerson about her health.

60. However, following the schedule change, SVP Davis became even more brazen and intrusive in her comments regarding Dickerson's health. For example, in or about late April 2022, Davis called Dickerson into her office and questioned her at length about her medical condition in front of Senior Director Brian Blake, continuing to insist that she "need[ed]" Dickerson to get better sooner.

61. Davis's treatment continued throughout the summer of 2022 and caused ongoing harm and a worsening of Dickerson's medical condition. By August 2022, her health had deteriorated into a full medical crisis.

62. On or about August 27, 2022, Dickerson called SVP Davis and informed her that she was experiencing a medical crisis. She explained that she was considering contacting Human Resources to inquire about taking disability leave, but at a minimum, she believed she needed to travel to California to receive care and support from her family. Dickerson asked if she could work remotely during that time, which she anticipated would last one to two weeks.

63. SVP Davis responded that Dickerson could go to California and work remotely during that time.

64. The following day, Dickerson purchased a ticket to California based on her conversation with SVP Davis and contacted Distler to inform her of the situation and inquire about short-term disability leave.

65. Dickerson departed for California that night.

66. On August 30, 2022, SVP Davis called Dickerson and took a sharply different tone. She stated that she was upset that Dickerson had traveled to California and that she did not approve of full remote work. SVP Davis added that she believed the position required in-office attendance that "nothing would change," that Dickerson "could not work from home," and said, "Maybe this job is not a good fit for you."

67. SVP Davis's comments were particularly shocking given that Dickerson had already traveled to California in reliance on SVP Davis's earlier assurance. It was unclear how SVP Davis expected Dickerson to return to the office other than by immediately purchasing a return flight to New York, which she did not feel financially or emotionally prepared to do. This, combined with SVP Davis's suggestion that the job was not a "fit," made it clear that she was pressuring her to resign.

68. On September 5, 2022, Dickerson emailed SVP Davis and complained about SVP Davis's behavior during their August 30 call. She stated that she felt caught off guard by the call, especially since they had already agreed on a temporary accommodation.

69. Dickerson further expressed that SVP Davis's comments made her uncomfortable and that she felt pressured to resign because she had requested accommodation. She described the treatment as unfair and stated that the message she received was that continued employment would not include the accommodations she needed. She ended the email by stating her intent to use some of her PTO while preparing to formally request disability leave.

70. On September 6, 2022, SVP Davis responded to Dickerson, copying Distler, claiming she did not intend to pressure Dickerson to resign, but added Dickerson should make "Whatever decision… is best for [her]," referring to a potential resignation.

71. Later that day, Dickerson and Distler spoke by phone regarding her medical needs and potential accommodations, including additional remote work flexibility, disability leave, or resignation. During the call, Distler did not address SVP Davis's recent conduct or the complaint that Dickerson had made about being pressured to resign because of her disability and related requests for accommodation.

72. After the call, Distler emailed Davis, stating that she had spoken with Dickerson about her accommodation needs and that Dickerson was weighing her options and would continue the discussion the following week.

73. In response, SVP Davis stated that she would not approve any additional remote work than previously agreed. She added that her agreement to full remote work during Dickerson's mental health crisis had only been due to her own (SVP Davis's) travel schedule.

74. This only reinforced what had already become clear to Dickerson: SVP Davis was increasingly hostile toward her disability-related accommodation requests and opposed providing the reasonable adjustments necessary for her to perform her job in the future.

75. Realizing she had no viable option – particularly while in the midst of a medical crisis and unable to return to the office as required – Dickerson resigned from her employment on September 8, 2022.

76. Her resignation became effective on September 30, 2022.

77. The treatment Dickerson was subjected to had devastating effects on her health and well-being. The repeated denials, intrusive questioning, and disparate application of remote work policies caused her severe emotional distress and exacerbated her underlying medical conditions.

78. As a result of this mistreatment, Dickerson experienced a medical crisis that rendered her unable to continue working under the conditions imposed by SVP Davis. Being forced to resign in the midst of that crisis not only left her emotionally overwhelmed and physically unwell, but also resulted in the immediate loss of employer-sponsored health insurance – cutting off access to critical care at a time when she needed it most.

79. The consequences of the NHL's actions have been profound and long-lasting. Dickerson has suffered irreparable harm to her physical and mental health, her financial stability, and her professional trajectory. To this day, she continues to experience symptoms stemming from the trauma of her treatment at NHL, which has significantly impacted her daily functioning and overall ability to recover.

### FIRST CAUSE OF ACTION:
### Discrimination in violation of the NYSHRL

80. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein

81. Defendants unlawfully discriminated against Plaintiff based on her disability in violation of the NYSHRL, by subjecting her to disparate treatment, a hostile work environment, and constructive discharge as a result of her disability and related accommodation requests.

82. As a result, Plaintiff has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

83. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages under the NYSHRL.

84. Plaintiff is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

### SECOND CAUSE OF ACTION:
### Retaliation in violation of the NYSHRL

85. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

86. Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and constructively discharged her employment on the basis of her legally protected activities, in violation of NYSHRL.

87. As a result, Plaintiff has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

88. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages under the NYSHRL.

89. Plaintiff is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees and costs.

### THIRD CAUSE OF ACTION:
### Discrimination in violation of the NYCHRL

90. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

91. Defendants unlawfully discriminated against Plaintiff based on her disability in violation of the NYCHRL, by subjecting her to disparate treatment, a hostile work environment, and constructive discharge as a result off her disability and related accommodation requests.

92. As a result, Plaintiff has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

93. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages under the NYCHRL.

94. Plaintiff is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## FOURTH CAUSE OF ACTION:
### Retaliation in violation of the NYCHRL

95. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

96. Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and constructively discharged her employment on the basis of her legally protected activities, in violation of NYCHRL.

97. As a result, Plaintiff has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

98. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages under the NYSHRL.

99. Plaintiff is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, it is respectfully requested that the Court enter judgment for Plaintiff and against Defendant, in amounts to be determined by the finder of fact, awarding economic, compensatory, and punitive damages, attorney's fees, and costs, and granting such other relief as may be just.

## JURY DEMAND

Pursuant to FRCP § 38(b), Plaintiff demands a trial by jury.

Dated: New York, New York
September 5, 2025

LIPSKY LOWE LLP

/s/Douglas Lipsky
Douglas Lipsky
Travis Pierre-Louis
420 Lexington Avenue, Suite 1830
New York, New York 10170-1830
Tel: 212.392.4772
doug@lipskylowe.com
travis@lipskylowe.com